# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs March 26, 2013

## STATE OF TENNESSEE v. BILLY LEBRON BURSON

**Direct Appeal from the Criminal Court for Hamilton County**
No. 273398     Don W. Poole, Judge

**No. E2012-01289-CCA-R3-CD - Filed August 20, 2013**

A Hamilton County Criminal Court Jury convicted the appellant, Billy Lebron Burson, of three counts of misdemeanor reckless endangerment, three counts of aggravated assault, and felony reckless endangerment.  The trial court merged the misdemeanor reckless endangerment convictions into the aggravated assault convictions and imposed a total effective sentence of six years in the Tennessee Department of Correction, which was to be served consecutively to a federal sentence.  On appeal, the appellant challenges the sufficiency of the evidence sustaining his aggravated assault convictions, the sentences imposed, and the trial court's admission of testimony from the State's "firearms expert." Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Hannah C. Stokes, Chattanooga, Tennessee, for the appellant, Billy Lebron Burson.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and Bates Bryan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's charges stemmed from his involvement in the events that occurred on July 21, 2009, at 2006 Ivy Street in Chattanooga, which resulted in the death of Justin Crutcher.  The Hamilton County Grand Jury originally indicted the appellant for the

attempted first degree murders of Davorius Appleberry, Kamilah Smartt, and Terkeria Owens; the aggravated assaults of Davorius Appleberry, Kamilah Smartt, and Terkeria Owens; and felony reckless endangerment.

At trial, Davorius Appleberry testified that he lived at 2006 Ivy Street with his father, Tracy Appleberry; his stepmother, Tameka Wooten; several younger siblings; and Terkeria Owens. The appellant occasionally visited his relatives who lived across the street from the Appleberrys.

Davorius[1] said that on the night of July 21, 2009, he and three friends were sitting outside at a friend's house which was located across the street from Davorius's house. The appellant arrived in a truck with Justin Crutcher, whom Davorius knew as "Mad Face" or "Mad Dog." The appellant and Crutcher got out of the truck and sat on the hood. The appellant pulled out a gun, began playing with it, and asked Davorius, "[W]here [is] the money?" Davorius thought the appellant was "just playing" because he never pointed the gun at anyone.

Davorius stated that he went home when a bondsman came to the Appleberry residence to look for someone they thought stayed at the house. The other individuals who were outside also left, including the appellant. After the bondsman departed, Davorius went back outside and saw that the appellant had returned and was "bumping" his truck against a car owned by the appellant's cousin, Sheba Chapple. Davorius sat outside with his hands in his pockets because it was cold. Crutcher walked past Davorius and asked Davorius, "What's cracking?" Davorius responded, "[A]in't nothing cracking with me." Crutcher then asked why Davorius had his hands in his pockets, and Davorius replied that, "I can do it [if] I want to." Despite Davorius asking Crutcher to leave, he would not and kept "talking crazy," insisting that Davorius remove his hands from his pockets. Davorius thought that Crutcher suspected Davorius had a weapon in his pocket.

Davorius said that he felt "like something was about to happen" because the appellant had "pulled out that gun and asked where the money. . . . I ain't never had no problem with [the appellant] . . . but I just feel like why would you out the blue say something that he had said." Therefore, Davorius knocked on the back door of his house to try to wake Tracy. When Tracy did not answer the door, Davorius returned to the front of the home and found Crutcher arguing with Owens and Owens's cousin, Kamilah Smartt. Davorius again knocked on the back door and managed to wake Tracy, who staggered to the back door. Davorius told Tracy that some people were outside "talking crazy." Davorius did not see Tracy in possession of a gun. Davorius stepped into the house and thought Tracy went outside. As

---

[1]Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

Davorius walked toward the living room, he heard shots being fired. He felt "[u]nsafe" and worried about his siblings. He and his sister gathered their siblings and hid in the bathroom. When the gunfire stopped, Davorius stepped out of the bathroom and saw broken glass everywhere and bullet holes throughout the house. Davorius said that when Tracy returned to the house, the police placed Tracy in a patrol car while they investigated and spoke with Davorius. Davorius stated that he did not see any of the shots being fired but reiterated that he had seen the appellant earlier that evening in possession of a weapon.

On cross-examination, Davorius said that he thought the events began around midnight or 1:00 a.m. and that the bondsman arrived five or ten minutes prior to the shooting. Davorius acknowledged that initially he had not felt threatened when he saw the appellant with a gun. He explained that he had no previous problems with the appellant, that the appellant had not threatened him, and that the argument earlier that day had been between him and Crutcher, not the appellant. Davorius recalled that in addition to him, the appellant, and Crutcher, the following people were present in the street that night: "Weezie," Owens, Smartt, and Chapple. Davorius acknowledged that in a statement to the police, he said that at one point, the appellant "'was holding [Crutcher] back.'" Davorius stated that Crutcher was killed during the shooting.

At the request of the State and without objection by the defense, the trial court took judicial notice of information from the National Weather Service's web site that revealed the temperature was 67 degrees at 1:00 a.m., which was around the time of the shooting. The trial court instructed the jury that it was "not required to accept as conclusive any facts judicially noticed."

Tracy Lebron Appleberry, Davorius's father, testified that he lived at 2006 Ivy Street with Wooten and nine of their children. On the night of July 21, 2009, he and Wooten went to bed around midnight. He was later awakened by Davorius knocking on the back door of the house, saying, "Pops, somebody [is] shooting." Tracy heard two shots and then went out the back door, armed with his .357 caliber gun. He saw the appellant standing by "the neighbor's bush." Crutcher "ran up on" Tracy, Tracy heard two more shots, felt a bullet graze his leg, and bent down to look at his leg. When he looked up, he saw Crutcher raise his hands. Believing Crutcher to be armed and preparing to shoot, Tracy fired his gun. Tracy said that he was scared, that he had never shot anyone, and that he jumped over a fence and fled. As he fled, he heard more shots. Tracy ran to his sister's home and called Wooten, who informed him that the police wanted to speak with him. He returned home and turned himself in to the police. He showed them where he had hidden the gun used to shoot Crutcher.

On cross-examination, Tracy said that he did not hear the appellant make any threats on the evening of the shooting and that he did not see the appellant with a gun. He also said

-3-

that he had no prior problems with the appellant. Tracy said that he did not know Crutcher before that night.

Wooten's daughter, Terkeria Nicole Owens, who lived at 2006 Ivy Street, testified that in the early morning hours of July 21, 2009, several people were present in the residence, including Owens's cousins, Smartt and Rakita Ware. Around midnight, Owens walked Smartt to Smartt's car, and the two women sat in the car, talking. The appellant's cousin, Chapple, arrived in her car, and Owens got out of Smartt's car and began speaking with Chapple. The appellant arrived and hit the back of Chapple's car with his vehicle, pushing it "halfway down the street." Chapple put the car in drive and parked in front of another car. The appellant parked beside her, and Chapple began cursing the appellant. Crutcher got out of the appellant's vehicle, and the appellant backed up and parked behind Smartt's car.

Owens heard Crutcher repeatedly ask Davorius, "[W]hat's cracking?" Smartt got out of her car, and she and Owens walked towards the men. Owens asked Crutcher to leave because "you don't come to nobody's house starting problems." Crutcher began cursing, told her to shut up, and warned her that he "knock[s] b[*]tches out too." Smartt tried to talk with Crutcher, but he began cursing her, and the arguing continued.

As the arguing continued, Owens saw the appellant talk to Smartt, walk to his car, return to the driveway, and "flash[]" his gun at the group without removing the gun from his pocket. Owens stepped back, and the appellant tried to pull Crutcher away from the others. Crutcher escaped from the appellant and ran up the driveway. Owens and Smartt ran into the house to warn those inside that "they was going to shoot up the house." After they were inside the house, the shooting began. Owens heard at least five shots, one of which hit the couch where her two-year-old brother had been moments earlier. Owens said that she was in fear for her life. Following the shooting, the police arrived, and Owens gave a statement.

On cross-examination, Owens said that earlier that night, she was in the house asleep but was awakened by a bondsman. Soon thereafter, Owens walked Smartt to her car. Owens and Smartt were talking in the car for less than five minutes when Chapple arrived. Owens got out of Smartt's car and stood at the passenger side of Chapple's car, "hanging in her window, talking to her." Owens said that the appellant never threatened her or Smartt and that he and Chapple tried to "diffuse th[e] situation" between Crutcher, Owens, and Smartt. Owens recalled that the appellant and Crutcher both drank beer that night. Owens acknowledged that she did not see anyone shooting that night. She told the police that after the shooting stopped, she heard a car drive away. Owens stated that she felt threatened by the appellant's lifting his shirt to show he had a gun in his pocket.

Tameka Wooten testified that on July 21, 2009, she was living at 2006 Ivy Street with Tracy and their children. Smartt brought Wooten home at approximately 2:00 a.m., and

-4-

Smartt went inside the house to use the bathroom. Davorius went across the street to a friend's house. Eventually, Wooten went to bed, but she was awakened when a bondsman came to the house searching for someone. Afterward, Wooten started to return to bed and heard Davorius knock on the back door, calling for Tracy with "fear in his voice." Tracy went to check the situation then returned to bed. Wooten then heard gunshots and saw Tracy run out the back door. Tracy later called Wooten, and she told him to come home, explaining that the police were there and that "there's a boy laying out here in the street dead."

On cross-examination, Wooten said that the shooting began approximately fifteen to twenty minutes after the bondsman left. Wooten did not witness any shooting that evening and was not sure who was outside. She stated that she had no prior problems with the appellant.

Kamilah Smartt testified that in the early morning hours of July 21, 2009, she took Wooten home and went inside with her. A bondsman came to the house to look for someone. After the bondsman left, Owens walked Smartt to her car and they sat inside the car, talking. Chapple drove by and stopped her car beside Smartt's car. Owens and Smartt got out to speak with Chapple. As they were talking, the appellant drove up behind Chapple's car and repeatedly "shoved the back of her car" with his vehicle. To stop the appellant, Chapple parked in front of Wooten's van. The appellant stopped his vehicle beside Chapple's car, and they began "passing words to each other." Crutcher got out of the appellant's vehicle and walked up the Appleberrys' driveway. The appellant parked behind Smartt then followed Crutcher.

Smartt said that she and Owens stayed by Chapple's car until they heard arguing. They then walked up the driveway and saw Davorius and Crutcher arguing. Smartt told Crutcher that "you can't come to people's house arguing and, you know, trying to start something." Crutcher cursed at Smartt, "saying he fight girls and he hit women and all this." Smartt told him that he would not hit her, and he left her alone. Owens told Crutcher to leave, and he cursed her. Crutcher started walking back to the appellant's vehicle, and Owens "started arguing." Crutcher came "flying like a crazy man" towards Owens. Smartt and Owens ran inside the house, looked out the living room window, and saw the appellant approaching the house with a gun in his hand. Smartt shouted a warning, and everyone ran to the back of the house. As Smartt left the window, she heard shots being fired, several of which hit the house. Smartt never saw Crutcher with a gun. Smartt reiterated that she saw the appellant "with a gun, . . . and he let that thing rip."

On cross-examination, Smartt said that Davorius and Crutcher argued for about five minutes before she and Owens intervened. The appellant did not say anything during the argument, and he and Chapple tried to get Crutcher to leave. After the shooting, Smartt said she saw a Bronco speed away from the scene. Although she could not see who was driving,

she assumed it was the appellant because it was his vehicle. Smartt estimated that the entire incident lasted less than thirty minutes.

Chattanooga Police Detective Adam Emery testified that on July 21, 2009, a 911 call regarding this incident was received at 1:58 a.m. Two minutes later, a second call was placed saying that the suspect had fled in a Bronco. As Detective Emery was en route to 2006 Ivy Street, he called an officer on the scene and was informed that a person had been shot in the chest and "it did not look good." When Detective Emery arrived at the scene, he was informed that the victim had died at the hospital. Detective Emery learned that an altercation had occurred and that Chapple was a witness. Chapple told Detective Emery that Tracy had shot Crutcher, and she identified Wooten as Tracy's girlfriend. Because Chapple was uncomfortable speaking where she could be overheard, Detective Emery had her transported to the service center to be interviewed by Detective Mercado.

After Chapple left, Detective Emery spoke with Wooten, who acknowledged that Tracy had been involved in the incident. At the request of the police, Wooten called Tracy and arranged for him to turn himself in. Tracy complied and informed the police, "I shot in defense of my family and others because somebody was shooting up my house." At the scene, Detective Emery and another officer interviewed the witnesses. Thereafter, the police began searching for the appellant. Detectives Emery and Mercado asked Chapple where the appellant was, but she refused to disclose his location.

Detective Emery stated that a .357 caliber shell casing was found at the crime scene, about midway down the driveway. Additionally, a .357 caliber bullet was retrieved from Crutcher's body during the autopsy. Tracy and Davorius led officers to the location of Tracy's .357 magnum revolver, and ballistics testing revealed that the bullet that killed Crutcher was fired from Tracy's gun. Detective Emery said that officers performed gunshot residue tests on Tracy and Crutcher; however, the testing kits were faulty, and the results were not valid. Detective Emery stated that a .357 magnum is a type of revolver that holds five or six bullets. The police found a single shell casing, and the other chambers of the gun were empty. Tracy later told Detective Emery that only one bullet had been in the gun.

Detective Emery acknowledged that he did not attend the autopsy of Crutcher but that the results revealed Crutcher died as a result of a gunshot wound to the chest. The autopsy report also revealed the presence of stippling around the gunshot wound, indicating that the gun was fired from a relatively close distance.

On cross-examination, Detective Emery testified that a request was submitted to the Tennessee Bureau of Investigation (TBI) for DNA and fingerprint testing to be performed on a .38 caliber bullet that was recovered near the street. However, the TBI report revealed that neither test was performed, and Detective Emery speculated that the scientists had

concluded "there was no way to perform those tests on that cartridge." Detective Emery stated that most of the evidence came from witness statements, explaining that Tracy and his family all gave statements and cooperated with the investigation but that the appellant and Chapple did not.

Greg Mardis, a crime scene investigator with the Chattanooga Police Department, testified that on July 21, 2009, he and other members of the crime scene unit, namely Investigator McGhee, Investigator Mance, and Sergeant Whitfield, responded to the scene at 2006 Ivy Street. Investigator Mardis found multiple .45 caliber bullet fragments and one unfired .45 caliber cartridge. Testing revealed that all of the .45 caliber bullets had been fired from the same .45 caliber weapon. Investigator Mardis said that the rifling on the bullets was "common to a variety of .45 caliber weapons, some of the more commonly encountered brands included High Point and others." Investigator Mardis saw that several bullets had hit the windows and doors of the residence and that some of those bullets had traveled into the living areas of the residence. Davorius told the crime scene investigators that a .357 magnum revolver was located behind a house "the next street over." The investigators retrieved the revolver and later obtained an expended .357 caliber bullet found in Crutcher's body during the autopsy.

On cross-examination, Investigator Mardis stated that the .357 revolver was the only handgun found at the scene, that the revolver was the weapon that killed Crutcher, and that Tracy fired the revolver. He noted that there was evidence of two weapons being on the scene: the .357 revolver and a .45 caliber gun; he stated that there was no evidence of a third gun. He acknowledged that no fingerprints were collected from any of the shell casings. He explained that although a person would have had to touch each bullet while loading the gun, retrieving a print from a casing was "almost impossible." Investigator Mardis said that gunshot residue tests were performed on Tracy and Crutcher but that, due to contamination of the controlled swabs, no analysis was performed. He said that gunshot residue testing was not performed on the appellant because he did not come to the police station until over twenty-four hours after the shooting. Investigator Mardis said that "24 hours later, if he's washed his hands, changed his clothes, anything, [the gunshot residue would be] gone."

Defense counsel showed Investigator Mardis a magazine for a semiautomatic pistol that was similar to the gun that fired the .45 caliber bullets found on the scene. Investigator Mardis stated that the rounds of the gun were held in a magazine. He explained the term "semiautomatic" as meaning that after the gun was fired, the fired cartridge was expelled from the gun, the next round was pulled up from the magazine, and the gun was ready to fire again. Investigator Mardis stated that some semiautomatic pistols expel the spent cartridge "to the right, some straight up, some down, some to the side." He did not know to which side the .45 caliber gun at the scene expelled its spent cartridges.

Charles Park, a court security officer employed by the Hamilton County Sheriff's Department, testified that he had substantial experience with firearms, that he had been a firearms instructor since 1967, and that he was familiar with the "standard issue, 1911 .45 caliber [semiautomatic] handgun" that had been issued by the United States Army. He said that the standard Colt model gun generally held seven rounds in the magazine and one in the chamber but that certain "after-market magazines" could hold eight rounds in the magazine and one round in the chamber. He stated that the gun was a single action pistol that could not be fired by simply pulling the trigger; instead, the hammer had to be "pulled to the rear" before firing. He explained that "if you have a misfire, the round in the chamber is not fired, or your chamber is empty," the gun could be "rack[ed]" by pulling the "slide back and releas[ing] it to load a round into the chamber from the magazine." If the gun were racked with a bullet in the chamber, a live bullet could be ejected from the gun. Deputy Park said that after the Army stopped issuing the Colt .45 caliber pistol, other manufacturers began producing guns that were essentially "clones" of that pistol and that those guns predominantly held seven rounds in the magazine and one in the chamber.

On cross-examination, Deputy Park stated that he did not consider himself to be an expert and that he had never been certified as such. He also stated that he had no specific knowledge of the crime and had not been shown a gun that had fired the .45 caliber bullets at issue. He said that he did not know he was going to testify until that morning. At that point, the following colloquy occurred:

> [Defense counsel:] Which side to the casings normally eject from the semiautomatic weapons?
>
> [Deputy Park:] Again, you're going to have to go to different variations of models. If we want to continue with the 1911 Colt .45 –
>
> [Defense counsel:] No, I don't want a specific gun, I want a generalization if that's what you're going to give today.
>
> [Deputy Park:] Generally, they eject to the right on a semiautomatic.

After the State rested its case-in-chief, the defense called Sheba Chapple as its sole witness. Chapple testified that the appellant was her cousin and that she was at the scene at the time of the shooting. She denied that the appellant "bump[ed]" her car or that they had "any issues" that evening. She was present when Crutcher argued with Davorius, Smartt, and Owens "halfway up" the driveway of the Appleberry residence. She said that Owens and Smartt were threatening Crutcher and that "he was threatening them back." Chapple and the

appellant told Crutcher to stop arguing and tried to pull him to the appellant's car and away from the scene. However, when they reached the bottom of the driveway, Crutcher broke free and charged back up the driveway. The appellant, who was standing on the sidewalk near the street, chased Crutcher. As Crutcher ran up the driveway, Chapple heard the shot that killed Crutcher. Chapple and the appellant ran to Crutcher's side to help, and Chapple heard other shots being fired. Chapple did not see the appellant with a gun and did not see him shooting.

On cross-examination, Chapple said that Owens and Smartt had "threatened [Crutcher] with objects" and that she had tried to intervene to stop the argument. She maintained that she did not see Crutcher with a gun. Chapple could not discern the location from where the shots were fired.

The jury found the appellant guilty of three counts of the lesser-included offense of misdemeanor reckless endangerment, three counts of aggravated assault, and one count of felony reckless endangerment. At sentencing, the trial court merged the reckless endangerment convictions with the aggravated assault convictions. The court then sentenced the appellant to six years for each aggravated assault conviction and to two years for the felony reckless endangerment conviction. The court further ordered that the sentences be served concurrently with each other but consecutively to a separate federal sentence.

On appeal, the appellant challenges the sufficiency of the evidence sustaining his aggravated assault convictions, the sentences imposed, and the trial court's admission of testimony from Deputy Park.

## II. Analysis

### A. Admission of Testimony

The appellant contends that the trial court erred by allowing the State to introduce the testimony of Deputy Park as a firearms expert without notifying the appellant of the witness prior to trial. In response, the State maintains that Deputy Park was not offered as a firearms expert and that his testimony as a lay witness was admissible. The appellant asserts that the trial court stated that the witness was testifying as an expert and that, if the witness was not an expert, his "opinion counts for *nothing more than inadmissible speculation*."

At trial, the State informed the trial court that it wished to call Deputy Park "for a simple question or two about .45 handguns." The State explained that Deputy Park was "extremely knowledgeable in the area of firearms, and much more than just about anyone else. I know that my officers all have some experience, but it's like a big hobby of his." Defense counsel objected based upon the State's failure to disclose prior to trial that it

planned to call an expert witness. The State asserted, "I'm not submitting him as an expert, just someone who's familiar with the .45 handgun." The trial court said that before the State called Deputy Park, defense counsel would have an opportunity to speak with him "and see if there's any objection at that point."

Thereafter, defense counsel renewed the objection, again asserting that if Deputy Park was an expert, the State was required to give advance notice. Further, defense counsel stated that if Deputy Park was not an expert, "then anything he says is speculation [and] only an expert can give an opinion on something." In response, the following colloquy occurred:

> [The State]: I'm not submitting him as an expert, I'm submitting him on his general knowledge, he has a lot of experience with .45s. He could qualify, probably, as an expert, but I have no interest in qualifying him as an expert.

> [The Court]: Well, I think, probably, based on what both lawyers have said, I think he is being introduced as an expert, if you're giving an opinion.

> [The State]: Well, it's not an opinion, it's an observation as to the number of rounds that go into a weapon. That's not an expert opinion.

> . . . .

> [The Court]: Well, and I'm going to allow him to testify for this reason: There have been a lot of questions asked of the other police officers. Now, this is a police officer that you intend to call who is going to testify about the workings of either a .45 caliber or .357 magnum. Based upon what's already been asked of other people, certainly I'll let him testify as to generalized knowledge of the workings of one and/or both of those weapons, based upon what has been gone into on both sides. So I'll allow him to do that.

> Now, if we get into something about opinions or something, if he's going to get up and say how many rounds are in a .357 or .45 or which side they extract from, all those questions have been asked, I'll allow him to testify concerning those matters, but if he gets into too much opinion stuff, then I'll take [the defense's] objections at that time, okay? So I'll allow

-10-

[the State] to put him on for that purpose.

There is no dispute that the State did not provide notice of expert testimony. Therefore, we must determine whether Deputy Park testified as an expert or a lay witness. Generally, the trial court has broad discretion in determining the qualifications, admissibility, relevancy, and competency of expert testimony. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). As such, this court will not overturn the trial court's ruling on the admissibility of expert testimony absent an abuse of that discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

Expert testimony must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997). Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

In the instant case, the State asserted that it did not consider Deputy Park to be an expert. The trial court expressly stated that Deputy Park was to testify only regarding generalizations and cautioned that if he offered opinion testimony, the court would revisit the objection. Moreover, during his testimony, Deputy Park denied being an expert and acknowledged that he had never been certified as a firearms expert. Accordingly, we conclude that Deputy Park did not testify as an expert witness.

Next, we must determine whether Deputy Park's testimony as a lay witness was admissible. Rule 701(a) of the Tennessee Rules of Evidence, which governs the admission of opinion testimony offered by non-experts, states:

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inference which are
>
> > (1) rationally based on the perception of the witness and
> >
> > (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

-11-

Generally, the testimony of a non-expert witnesses must be confined to a narration of the facts based on their first-hand knowledge. Blackburn v. Murphy, 737 S.W.2d 529, 531 (Tenn. 1987). The witness must avoid stating their personal opinions, conclusions, or opinions regarding the facts about which they have testified. Id. "An exception to this general rule exists where testimony in an opinion form describes the witness's observations in the only way in which they can be clearly described, such as testimony that a footprint in snow looked like someone had slipped or that a substance appeared to be blood." State v. Brown, 836 S.W.2d 530, 549-50 (Tenn. 1992) (citations omitted).

In the instant case, Deputy Park testified generally about the operation of a .45 caliber gun and his experience with the weapon. Deputy Park asserted that he did not consider himself to be an expert and that he had no specific knowledge of the case. His testimony did not consist of an opinion and was limited to his general knowledge and experience concerning a specific type of weapon. Accordingly, we conclude that the trial court did not abuse its discretion in allowing Deputy Park's testimony to be admitted.

Regardless, the proof at trial revealed that there were only two guns at the scene, a .357 magnum and a .45 caliber semiautomatic pistol. The police recovered the .357 magnum, which belonged to Tracy, but never found the .45 caliber semiautomatic pistol. While Tracy thought Crutcher might have had a gun, he did not definitively see him with one. However, Davorius, Owens, and Smart saw the appellant with a pistol, Smartt said the shooting started immediately after she saw the appellant approach the house with a gun pointed at the house, and Chapple and Smartt stated that Crutcher did not have a gun. Therefore, the proof reveals that only Tracy and the appellant had guns at the scene. Moreover, Sergeant Darrell Whitfield testified that he could not recall ever seeing a semiautomatic pistol eject a shell casing to the left. Investigator Mardis testified that some semiautomatic pistols expel spent cartridges "to the right, some straight up, some down, some to the side" but that, because the police never found the .45 caliber pistol used in this case, he did not know to which side the .45 caliber gun at the scene expelled its spent cartridges. Deputy Park testified that generally semiautomatic weapons ejected cartridges to the right but that there could be differences in the "variations of models." Accordingly, the testimony of Sergeant Whitfield and Investigator Mardis were essentially the same as the testimony of Deputy Park. Further, none of the witnesses saw the position of the shooter at the time of the shooting. Therefore, we conclude that if the admission of the testimony of Deputy Park was error, such error was harmless. See Tenn. R. App. P. 36(b).

## B. Sufficiency of the Evidence

The appellant contends that the evidence presented to the jury was not sufficient to support his convictions for the aggravated assaults of Davorius, Smartt, and Owens. He specifically asserts that "[t]he testimony at trial showed that none of the three alleged victims

were actually in fear for their safety from the [appellant], nor were any of the alleged victims injured or touched in any way by the [appellant]. Therefore, none of the elements of assault or aggravated assault were met." (Emphasis omitted).

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The appellant was convicted of aggravated assault. A person commits an aggravated assault under Tennessee law when he intentionally or knowingly commits an assault and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B). An assault is defined as intentionally or knowingly causing another to reasonably fear imminent bodily injury. Tenn. Code Ann. § 39-13-101(a)(2).

The appellant specifically argues that Davorius testified he was never afraid of the appellant and did not feel threatened by him; that Owens testified the appellant did not threaten her, that he tried to diffuse the situation, that he did not assault her; and that Smartt's testimony "should be discredited completely due to her inconsistencies under oath." He also contends that there was no credible testimony that he was the shooter.

The proof at trial revealed that the appellant was in possession of a handgun and that he repeatedly fired the gun at a house inhabited by several people. Although Davorius testified that initially he was not afraid because he thought the appellant was "just playing," as

the evening progressed, he became fearful when the appellant "pulled out that gun and asked where the money." Owens testified that she felt threatened when appellant lifted his shirt to show he had a gun in his pocket, explaining that she feared the appellant would fire the gun. Smartt said that when she saw the appellant approach the house with his gun drawn, she shouted a warning, and she and the others headed for the back of the house. She explained, "I'm not going to stand there and get my head blowed off and I know he got a pistol in his hand and I know what he fixing to do, too, with it, automatically." Davorius, Owens, and Smartt all testified that they were afraid for their lives when the shooting started. The jury, as was its prerogative, accredited the testimony of the State's witnesses. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). We conclude that the evidence is sufficient to support the appellant's convictions.

## C. Sentencing

Finally, the appellant challenges the length, manner of service, and consecutive nature of the sentences imposed by the trial court.

At the sentencing hearing, Brian Johnson, an officer with the State Board of Probation and Parole, testified that he prepared the twenty-three-year-old appellant's presentence report, which the State introduced as an exhibit. Since 2005, the appellant had been convicted in Tennessee of multiple misdemeanor offenses, including possession of a weapon, assault, driving on a revoked license, resisting arrest, false imprisonment, domestic violence, and misdemeanor theft. The appellant had received probationary sentences for the misdemeanor theft, domestic violence, and false imprisonment convictions, which were revoked. Additionally, the appellant was on probation for the assault conviction at the time the instant offenses were committed. Officer Johnson stated that on October 19, 2009, the appellant received a federal conviction for possession of a weapon after being convicted of domestic violence, which resulted in a thirty-six-month federal sentence.

On cross-examination, Officer Johnson stated that none of the victims submitted a victim impact statement.

The appellant's mother, Deborah Cross Bone, testified that if the appellant were released on probation, he could live with her. She stated that the appellant had obtained his high school diploma and that he was enrolled in a "[r]efrigeration, air conditioning" program at Chattanooga State. The appellant had done well in the program, had attended classes for one year, and could have obtained a certificate or a license after attending three or four more months of classes. Bone stated that the appellant had one child, whom he visited every weekend, and that he paid child support. She also stated that the appellant was a hard worker

and was employed by her brother's lawn care service.

On cross-examination, Bone said that the appellant had worked for her brother "off and on" since he was seventeen years old. The appellant had also worked at Taco Bell and Ruby Falls. The appellant moved out of her home when he was twenty years old.

The trial court noted that the appellant had been convicted of three counts of reckless endangerment, a Class A misdemeanor; three counts of aggravated assault, a Class C felony; and reckless endangerment, a Class E felony. See Tenn. Code Ann. §§ 39-13-102(e)(1), 39-13-103(b). Because the appellant was a Range I, standard offender, he was subject to a sentence of eleven months and twenty-nine days for each Class A misdemeanor conviction, a sentence of three to six years for each Class C felony conviction, and a sentence of one to two years for the Class E felony conviction. See Tenn. Code Ann. §§ 40-35-111(e)(1), 40-35-112(a)(3) and (5). The trial court merged the appellant's misdemeanor reckless endangerment convictions into the aggravated assault convictions.

To each of the convictions, the trial court applied enhancement factor (1), that the appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; enhancement factor (8), that the appellant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and enhancement factor (13)(C), that the appellant was on probation at the time of the commission of the felony offenses. See Tenn. Code Ann. § 40-35-114(1), (8), and (13)(C). To the felony reckless endangerment conviction, the court applied enhancement factor (10), that the appellant had no hesitation about committing a crime when the risk to human life was high. Id. at (10). The court applied no mitigating factors. The trial court imposed concurrent sentences of six years for each aggravated assault conviction and two years for the felony reckless endangerment conviction, for an effective sentence of six years.

The court found that the appellant's potential for rehabilitation was poor, noting that he had previously been given probation, which was unsuccessful. The court noted that the appellant was eligible for an alternative sentence and that he was considered to be a favorable candidate for alternative sentencing. However, the court found that the appellant was not suitable for an alternative sentence based upon his long history of criminal conduct, the seriousness of the offenses, and the appellant's unsuccessful attempts at serving an alternative sentence. See Tenn. Code Ann. §40-35-103(1).

Additionally, the court found that the sentences imposed in the instant case should be served consecutively to the previously imposed federal sentence.

On appeal, the appellant asserts that the trial court erred in determining the length of

his sentences for the aggravated assault convictions,[2] denying alternative sentencing, and ordering the sentences be served consecutively to a federal sentence.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

### 1. Length of Sentence

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

---

[2]The appellant makes no argument concerning his sentence for the felony reckless endangerment conviction.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The appellant argues that the trial court erred in imposing the maximum sentence for his aggravated assault convictions because he had no prior felony convictions and that the court failed to properly consider several sentencing considerations and mitigating factors. We disagree.

The record establishes that the trial court thoroughly considered the principles of sentencing, the testimony and exhibits offered at the sentencing hearing, the circumstances of the offenses, and the arguments presented by counsel. The court clearly considered the issue of mitigating factors and found none applicable. Moreover, the trial court clearly set forth its application of specific enhancement factors and the reasoning behind application of each. The trial court properly applied enhancement factor (1) because the appellant had ten prior misdemeanor convictions and one prior felony conviction. See Tenn. Code. Ann. § 40-35-114(1). The trial court properly applied enhancement factor (8) because the record reflects that at least two of the appellant's prior probationary sentences had been revoked and he was on probation for assault when the instant offenses were committed. See Tenn. Code Ann. § 40-35-114(8). We conclude that the trial court did not abuse its discretion by imposing a sentence of six years for each aggravated assault conviction.

## 2. Alternative Sentencing

The appellant summarily contends that the trial court "had the discretion to impose a suspended sentence of probation, opposed to a sentence to serve. Based on the sentencing guidelines and the evidence presented at the trial, the [trial court] should have imposed a probated sentence, or at the very least a shorter sentence within the guidelines." Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R.

10(b); see also Tenn. R. App. P. 27(a)(7). Based upon the appellant's failure to support the issue with argument, cite to the record, and cite to authority, we conclude that he has waived this issue.

### 3. Consecutive Sentencing

The appellant also contends that the trial court erred by ordering that his sentences be served consecutively to a prior federal sentence pursuant to Rule 32 of the Tennessee Rules of Criminal Procedure. He acknowledges that the federal sentencing was imposed prior to the trial in this case, but he contends that it was not a "prior unserved sentence as contemplated by Rule 32"and that, therefore, consecutive sentencing was not mandated.

Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). In the instant case, the trial court imposed consecutive sentencing based on Rule 32(c)(2)(B) of Tennessee Rules of Criminal Procedure, which provides:

> If, as the result of conviction in another state or in federal court, the defendant has an additional sentence or portion thereof to serve, the court shall impose a sentence that is consecutive to any such unserved sentence unless the court determines in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders.

The appellant's argument focuses wholly on the fact that the federal sentence was not imposed prior to his being charged in state court with the instant offenses. However, the rule does not mandate that the other state or federal sentence arise prior to the charges in the current case, only that the federal sentence be imposed prior to the Tennessee sentence. Cf. State v. Arnold, 824 S.W.2d 176 (Tenn. Crim. App. 1991) (stating that the last sentencing court has the responsibility of determining whether a sentence should be served consecutively). At the time the appellant was sentenced in this case, he was serving an outstanding federal sentence. Accordingly, Rule 32 mandated that the trial court order the state sentence to be served consecutively to the federal sentence unless there was "good cause" to run the sentences concurrently. The court explicitly found no "good cause" for concurrent sentencing, stating that the appellant "had a weapon two days before this event occurred[, which was the fact underlying his federal conviction,] and for all of the circumstances of this event, I don't find that there [is] any good cause and . . . [therefore, the sentence] is a mandatory term." We discern no error by the trial court's imposition of consecutive sentencing.

### III.  Conclusion

In sum, we conclude that the trial court did not err by allowing Deputy Park to testify, that there was sufficient evidence to support his aggravated assault convictions, and that the trial court did not err in sentencing.  Accordingly, the judgments of the trial court are affirmed.

 

_____

NORMA McGEE OGLE, JUDGE